# In the United States Court of Federal Claims

DYNCORP INTERNATIONAL LLC,

Plaintiff,

v.

THE UNITED STATES,

Defendant,

and

CACI TECHNOLOGIES, LLC f/k/a CACI
TECHNOLOGIES, INC.,

Intervenor-Defendant.

No. 20-cv-1293 C

Filed Under Seal: February 5, 2021

Publication: February 16, 2021[1]

*Scott Franklin Lane*, Thompson Coburn LLP, St. Louis, Missouri for Plaintiff.  With him on the briefs are *Katherine S. Nucci*; *Jayna Marie Rust*; *Edward W. Gray, Jr.*, Thompson Coburn LLP.

*Vijaya Surampudi*, United States Department of Justice, Civil Division, Washington, D.C. for Defendant.  With her on the briefs are *Jefferey Bossert Clark*, Assistant Attorney General, Civil Division; *Robert E. Kirschman, Jr.*, Director, Commercial Litigation; *Douglas K Mickle*, Assistant Director, Commercial Litigation, Washington, D.C.; *Stephen Hernandez*, U.S. Army Legal Services Agency, Fort Belvoir, VA.

*Craig S. King*, Arent Fox LLP, Washington, D.C. for Intervenor-Defendant.  With him on the briefs are *Richard J. Webber* and *Travis L. Mullaney*, Arent Fox LLP, Washington, D.C.

## <u>MEMORANDUM AND ORDER</u>

In this post-award bid protest, Plaintiff DynCorp International LLC (DynCorp) challenges

the United States Army's (Army or Government) decision to award a task order to CACI

Technologies, LLC f/k/a CACI Technologies, Inc. (CACI) under the Global Intelligence Support

---

[1] This Memorandum and Order was filed under seal in accordance with the Protective Order entered in this case (ECF No. 17) and was publicly reissued after the parties informed this Court that no redactions would be necessary for public release.  (ECF No. 50.)  The sealed and public versions of this Memorandum and Order are identical, other than the publication date and this footnote.

Services (GISS) multiple-award indefinite-delivery, indefinite-quantity (IDIQ) contract vehicle. *See* Complaint (ECF No. 1) (Compl.) at 1.  DynCorp claims that the Army exceeded the scope of the GISS IDIQ contract by awarding it to CACI Technologies, LLC (hereinafter CACI, LLC)— an allegedly different entity than CACI Technologies, Inc. (hereinafter CACI, Inc.), which submitted a proposal for the award.  Compl. ¶¶ 130-33.

Pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims (Rules or RCFC), Defendant United States and Intervenor-Defendant CACI each move the Court to dismiss Plaintiff's Complaint for lack of jurisdiction, alleging that the Federal Acquisition Streamlining Act (FASA) prohibits the protest of the award.  *See* Defendant's Motion to Dismiss (ECF No. 29) (Def. Mot.) at 1; Intervenor's Amended Motion to Dismiss (ECF No. 28) (Int.-Def. Mot.) at 2 (collectively, Defendants' Motions to Dismiss).

In response, DynCorp argues that, because the Army's task order award was made to an entity which was not an awardee of the IDIQ contract, the task order exceeded the scope of the GISS IDIQ contract and, therefore, is not barred by FASA.  *See* Plaintiff's Response and Opposition to Defendants' Motions to Dismiss (ECF No. 38) (Pl. Resp.) at 16.

On November 11, 2020, the Court held oral argument on Defendants' Motions to Dismiss. *See* Nov. 11, 2020 Tr. (ECF No. 45).  Due to the sensitive and important subject matter of the award at issue and the fast-approaching end of the voluntary stay in this action, the Court granted Defendants' Motions to Dismiss at oral argument and provided a summary of reasons for its decision on the record.  Nov. 11, 2020 Tr. at 71:18-72:20.

Following oral argument, the Court memorialized its rulings in an Order granting Defendants' Motions to Dismiss and noted that a separate Memorandum and Order would be

forthcoming.  *See* Nov. 11, 2020 Order (ECF No. 43).[2]  Consistent with this Court's November 11, 2020 Order, the present Memorandum and Order explains more fully the Court's reasons for dismissing Plaintiff's Complaint for lack of subject-matter jurisdiction.

## BACKGROUND

### I.   PROCUREMENT HISTORY

On September 12, 2014, DynCorp International LLC (Contract No. W911W4-14 D-0004) and CACI Technologies, Inc. (Contract No. W911W4-14-D-0003) were awarded contracts under the GISS IDIQ contract.  Tab 1 at Admin. R. (AR) 2 (CACI's Notice of Successful Offer); Tab 2 at AR 101 (DynCorp's Notice of Successful Offer).  At that time, GISS IDIQ contract awards had a ceiling of $5.04 billion.  Tabs 1 at AR 3; 2 at AR 102.  The "scope" of the services and products anticipated to be purchased under the GISS IDIQ contract, through task orders, was the following:

> **C.1.2 Objective / Scope.**
> The purpose of this acquisition is for INSCOM to provide more responsive acquisition of services for current and future Army intelligence, security, and information operations requirements and related support services. These services will supply resources that support a breadth and depth of various missions including but not limited to: intelligence analysis, electronic systems, Intelligence Surveillance and Reconnaissance (ISR) Systems, security systems, Quick Reaction Capability (QRC) systems, prototype intelligence hardware/software suites, facilities that are developed, deployed, maintained and repaired at the highest state of readiness, and business functions consistent with Army directives and standards.

Tab 1 at AR 17.

On September 12, 2018, the Army issued the Request for Task Order Proposal (RTOP), W911W4-18-ER02, for services to be provided under the GISS IDIQ contract to support the Army

---

[2] In that Order, the Court also denied as moot all other pending motions including: Plaintiff's Motion for a Preliminary Injunction (ECF No. 4); Defendant's Motion for Judgment on the Administrative Record (ECF No. 36); CACI's Motion for Judgment on the Administrative Record (ECF No. 35); Plaintiff's Cross-Motion for Judgment on the Administrative Record (ECF No. 41); and Plaintiff's Motion to Strike (ECF No. 42).

Intelligence and Security Command (INSCOM) G-4 unit.  Compl. ¶ 1; Tab 25 at AR 539.[3]  The RTOP was for a single task order on a cost-plus-fixed-fee basis for labor and a cost-no-fee basis for other direct costs.  Tab 25 at AR 541-47.  According to the RTOP, the task order was "for services to support tactical, operational, and strategic intelligence units, personnel and their ground and aerial intelligence equipment and operations facilities and infrastructure and may occur from multiple locations simultaneously." *Id.* at AR 540.

DynCorp and CACI each submitted proposals in response to the RTOP on October 12, 2018.  Tabs 27 and 27.1 at AR 1338.1-1376.21 (CACI's Proposal); Tab 28 at AR 1377-1415 (DynCorp's Proposal).  Both parties then submitted final proposal revisions in early-January 2020.  Tab 64 at AR 2618-2959 (CACI's Final Proposal Revision (January 6, 2020)); Tab 65 at AR 2960-2960.268 (DynCorp's Final Proposal Revisions (January 3, 2020)).  In both its initial proposal and its proposal revisions, CACI used the name CACI Technologies, Inc.  *See e.g.*, Tabs 27 at AR 1339; 64 at AR 2618.  On May 22, 2020, the Army awarded the task order to CACI Technologies, Inc.  Tabs 72 (CACI's Notice of Contract Award) and 72.1 (CACI's Task Order Signature Page) at AR 3406-3406.1.

## II.   NAME CHANGE

Previously, on November 27, 2017, CACI notified the Government of its intent to convert from a corporation to a limited liability company.  Tab 103.2 at AR 5127.  On December 31, 2017, CACI Technologies, Inc. converted to CACI Technologies, LLC under Virginia law.  Tab 98 at AR 4867-70.  Shortly thereafter, on March 13, 2018, CACI sent DCMA a "Contracts Conversion Approval Package," requesting that the Corporate Administrative Contracting Officer (CACO) at

---

[3] The Solicitation was amended six times.  The final solicitation, Amendment 06, issued on December 11, 2019.  Tab 61 at AR 2541.

DCMA recognize this conversion. *See id.* at AR 4798-4878. In its Contracts Conversion Approval Package, CACI informed DCMA of the key facts pertaining to the entity's conversion from CACI, Inc. to CACI, LLC.[4] *Id.* at AR 4798. Specifically, CACI represented that the new entity, CACI, LLC retained all the assets, obligations, and liabilities of CACI, Inc., and that CACI, LLC would fully perform all obligations existing under CACI, Inc.'s current contracts with the Government. *Id.* at AR 4800. CACO and DCMA legal counsel reviewed CACI's conversion request, finding that:

> Since CACI intends to convert its subsidiaries listed above from a corporation to a limited liability company (LLC) and each of these companies will continue to exist through the conversion as the same legal entity without interruption (same EINs, CAGE codes, etc.) these activities which will result in a Change of Name pursuant to FAR 42.1205. The name of the Companies will change from "Inc." to "LLC" as reflected in the table above. The CACO has reviewed the contractor's conversion packages for the requirements of FAR 42.1205, Agreement to Recognize Contractor Change of Name.

> The CACO confirmed the contractor's conversion packages each contained three signed copies of the Change-of-Name Agreement along with state documents effecting the conversion, opinion of the contractor's legal counsel stating the change of name was properly effected, and a list of all affected contracts. Assigned legal counsel completed review of the conversion packages on July 20, 2018. The only item legal counsel noted that needed correction was the date at the end of the first sentence, which should have be [sic] the date of the conversion. The contractor updated the date at the end of the first sentence to the date of the conversion on both the electronic and hard copies and resubmitted them on July 24, 2018.

> Based on my evaluation of the contractor's conversion packages and results the results of legal counsel's review and subsequent revision by the contractor, I believe it is in the best interest of the Government to recognize a successor in interest to the Government contracts in accordance with FAR 42.1204(a), (c), (d), and (h) for a corporation. Accordingly, I will execute the attached Change-of-Name conversion agreements and distribute to related parties.

Tab 103.1 at AR 5127-28 (DCMA's Memorandum for Record for CACI, Inc.).

---

[4] DCMA is the agency of the administrative contracting officer authorized pursuant to FAR 42.1202 to execute a change-of-name agreement with respect to CACI's contracts on behalf of the entire Government.

On April 6, 2020, just over two years after CACI submitted its Contracts Conversion Approval Package, the CACO approved CACI's request and modified CACI's contracts with the Government.  Tabs 98 at AR 4802; 102.1 at AR 5082.2.  Subsequently, CACI and DCMA entered into a "Conversion and Name Change Agreement" (Name Change Agreement) which states that the Government and CACI agree to seven primary points, including the following:

- CACI Technologies, LLC agrees to be bound by and to perform each contract [with DOD including the Army GISS multiple-award contract at issue in this protest referred to collectively as "the Contracts"] in accordance with the conditions contained in the contracts. CACI Technologies, LLC also assumes all obligations and liabilities of, and all claims against, CACI Technologies, Inc. under the contracts as if CACI Technologies, LLC were the original party to the contracts.

- CACI Technologies, LLC ratifies all previous actions taken by CACI Technologies, Inc. with respect to the contracts, with the same force and effect as if the action had been taken by CACI Technologies, LLC.

Tab 98 at AR 4800-03 (numbering in original replaced with bullet points).  The Name Change Agreement also gave retroactive effect to the name change, effective December 31, 2017.  Specifically, the Agreement stated:

- The Government recognizes CACI Technologies, LLC as CACI Technologies, Inc.'s successor in interest in and to the contracts.  Through the conversion, CACI Technologies, LLC became entitled to all rights, titles, and interests of CACI Technologies, Inc., in and to the Contracts as if CACI Technologies, LLC were the original party to the contracts. The Contracts covered by this Agreement are amended by substituting the name "CACI Technologies, LLC" for the name "CACI Technologies, Inc." wherever it appears in the Contracts, effective December 31, 2017.

   . . . .

- All payments and reimbursements previously made by the Government to CACI Technologies, Inc., and all other previous actions taken by the Government under the contracts, shall be considered to have discharged those parts of the Government's obligations under the contracts.  All payments  and reimbursements made by the Government after the effective date of this agreement in the name of or to CACI Technologies, Inc. shall have the same force and effect as if made to CACI Technologies, LLC, and

> shall constitute a complete discharge of the Government's obligations under the contracts to the extent of the amounts paid or reimbursed.

*Id*. at AR 4801 (numbering in original replaced with bullet points).

The Name Change Agreement identified multiple contracts that CACI, Inc. held with the Government, including the GISS IDIQ contract.   *Id*. at AR 4815-16.   The Name Change Agreement concluded that "[t]he Contracts shall remain in full force and effect, except as modified by this Agreement . . . ."  Tab 98 at AR 4802; *see also* Tab 102.1 at AR 5082.1-3 (June 4, 2020 Mass Modification Incorporating the Name Change Agreement) ("This agreement accomplishes a change of name/conversion only and all rights and obligations of the Government and of the Contractor are unaffected by this change.").

On June 22, 2020, CACI updated its registration in the System for Award Management (SAM) to reflect the name "CACI Technologies, LLC."  *See* Tab 86 at AR 4513 (CACI SAM Registration).  On August 25, 2020, the Army modified the name on CACI's GISS IDIQ contract to reflect the name CACI Technologies, LLC.  Tab 103.1 at AR 5125-26.

During the Government's reviewing and approval period, which took over two years, the Army and CACI continued to use "CACI Technologies, Inc." as the name of the legal entity that held the GISS IDIQ contract.  *See e.g.*, Tabs 56.1 at AR 2370.1 (October 21, 2019 Final Proposal Revision Using the Name CACI Technologies, Inc.); 64 at AR 2618 (January 6, 2020 Final Proposal Revisions Using the Name CACI Technologies, Inc.); 72 at AR 3406 (May 22, 2020 Notice of Contract Award Using the Name CACI Technologies, Inc.).  The DUNS number 057364507 and CAGE code 8D014 remained unchanged between the name changes from CACI

Technologies, Inc. to CACI Technologies, LLC.[5]  CACI's SAM registration remained active for those CAGE and DUNS codes throughout the RTOP procurement.

## III.   GAO PROTESTS

DynCorp filed three GAO protests involving this RTOP.  First, on May 28, 2019, DynCorp filed a GAO protest challenging various aspects of the Army's evaluation and source selection decisions and alleging the Army conducted misleading discussions with offerors.  Tab 42 at AR 1881-1913.  GAO dismissed DynCorp's protest pursuant to the Army's pending corrective actions. Tab 49 at AR 2146.  Second, on October 21, 2019, DynCorp filed a GAO protest alleging that certain revisions in the RTOP were unduly restrictive and that other terms in the RTOP were ambiguous.  Tab 57 at AR 2371-2536.  GAO again dismissed the protest because the Army granted the relief DynCorp was seeking.  Tab 60 at AR 2540.  Third, on June 16, 2020, DynCorp filed a GAO protest, against the same task order award in the case at bar.  *See* Tab 80 at AR 4061.

In its third GAO protest, DynCorp argued, *inter alia*, that CACI was ineligible for the task order award because CACI, Inc., the company that held the underlying GISS IDIQ contract, ceased to exist in December 2017, when it converted to CACI, LLC.  *See* Tabs 80 at AR 4062, 4081-84; 83 at AR 4340-43.  Therefore, according to DynCorp, CACI, Inc. could not submit a proposal or enter into a task order under the GISS IDIQ contract.  *Id.*

GAO rejected these arguments and found that the conversion and name change were properly effected and that the award was appropriate.  Tab 94 at AR 4762-78 (*DynCorp Int'l, LLC*,

---

[5] "[Commercial and Government Entity or (CAGE)] codes are assigned to discrete business entities by the Defense Logistics Agency and are used to dispositively establish the identity of a legal entity for contractual purposes . . . .  Similarly, DUNS numbers are established by Dunn & Bradstreet Information Services for purposes of establishing the precise identification of an offeror or contractor . . . .  CAGE codes and DUNS numbers are used to identify the entity that is the offeror for a given procurement."  *Raymond Express Int'l, LLC*, B-409872.3 at 6 (Comp. Gen. Sept. 11, 2015) (internal citations omitted).

B-417611.7 *et al*, 2020 CPD ¶ 342 (Comp. Gen. Sept. 24, 2020)) (GAO Decision).  GAO reasoned

that when CACI submitted its final proposal revision in January 2020, DCMA had not finalized

the conversion and name change agreement; and, consequently, the Government still viewed

CACI, Inc. as the holder of its existing government contracts.  GAO Decision at AR 4765-68.

Therefore, the GAO found that CACI acted appropriately when it used CACI, Inc. as the entity

name on its proposal in the RTOP procurement.  *Id.* at AR 4766-68.  The GAO also noted that,

because CAGE codes on CACI's GISS contract and CACI's proposal remained the same, the

agency was well aware of the offeror's identity.  *Id.* at AR 4767.  Accordingly, on September 24,

2020, the GAO denied DynCorp's protest.  *Id.* at AR 4778.

## IV.    COURT OF FEDERAL CLAIMS PROCEDURAL HISTORY

Following the GAO's decision, on September 30, 2020, DynCorp filed the present bid

protest against the Army's award to CACI under RTOP No. W911W4-18-R-ER02.  Compl. ¶ 1.[6]

At that time, DynCorp moved this Court for a temporary restraining order and a preliminary

injunction to prevent the Government from proceeding with the task order award.  *See* Plaintiff's

Application for a Temporary Restraining Order (ECF No. 3); Plaintiff's Motion for a Preliminary

Injunction (ECF No. 4).  On October 1, 2020, during the initial scheduling conference, the Court

denied Plaintiff's request for a temporary restraining order.  Oct. 1, 2020 Tr. (ECF No. 47) at 35:5-

7; Nov. 11, 2020 Order (ECF No. 43).  At that initial status conference, CACI also informed the

Court of its desire to file a motion to dismiss for lack of jurisdiction prior to reaching the merits of

DynCorp's protest.  *Id.* at 12:1-8.  The Court agreed with Intervenor-Defendant that jurisdiction is

---

[6] As a result of DynCorp's third GAO protest, the GAO made several determinations regarding various aspects of the Army's evaluation of proposals and source selection decision.  GAO Decision at AR 4762.  However, DynCorp does not challenge the GAO's decision on those grounds before this Court.  Instead, the Complaint contains two counts concerning CACI's name change and the scope of the underlying GISS IDIQ.  Compl. ¶ 114-37.

a threshold issue that should be decided before reaching the merits; however, in light of the important and time sensitive nature of the contract at issue, the Court ordered the parties to have overlapping briefing schedules for Defendants' Motions to Dismiss, Plaintiff's Motion for a Preliminary Injunction, and the Parties' Cross-Motions for Judgment on the Administrative Record. *See* ECF No. 18.[7]  The Administrative Record was filed on October 14, 2020. *See* ECF Nos. 27, 27-1, 27-2, 27-3, 27-4, 27-5.  On October 21, 2021, the Defendants each filed a motion to dismiss for lack of jurisdiction.  Further amendments were made to the Administrative Record on October 27, 2020. *See* ECF Nos. 37, 37-1.  On November 2, 2020, Plaintiff filed its response to Defendants' Motions, and Defendants subsequently filed their replies. *See* Pl. Resp.; Intervenor-Defendant's Reply to Plaintiff's Opposition to the Motions to Dismiss (Int.-Def. Reply) (ECF No. 39); Defendant's Reply in Support of Its Motion to Dismiss (Def. Reply) (ECF No. 40).  After briefing on Defendants' Motions to Dismiss concluded, the Court held oral argument on November 11, 2020 pertaining to Defendants' Motions to Dismiss. *See generally* Nov. 11, 2020 Tr. (ECF No. 45).  During oral argument, the Court granted Defendants' Motions to Dismiss and provided a summary of reasons for its decision on the record.  Nov. 11, 2020 Tr. at 71:18-72:20.  After oral argument the Court issued an Order memorializing its holding and denying all other pending motions as moot. *See* Nov. 11, 2020 Order.

## **STANDARD OF REVIEW**

Whether this Court has jurisdiction to decide the merits of a case is a threshold matter. *See PODS, Inc. v. Porta Stor, Inc.*, 484 F.3d 1359, 1365 (Fed. Cir. 2007).  When deciding a Rule 12(b)(1) motion to dismiss, a court must assume all the undisputed facts in the complaint are true

---

[7] Pursuant to the parties' requests, the Court amended its Scheduling Order multiple times. *See* ECF Nos. 26, 31, 33.

and draw reasonable inferences in the non-movant's favor. *Acevedo v. United States*, 824 F.3d 1365, 1368 (Fed. Cir. 2016). Further, the plaintiff bears the burden of establishing facts sufficient to invoke this Court's jurisdiction by a preponderance of the evidence. *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988). In determining whether a plaintiff has met this burden, courts may look "beyond the pleadings and 'inquire into jurisdictional facts' in order to determine whether jurisdiction exists." *Lechliter v. United States*, 70 Fed. Cl. 536, 543 (2006) (quoting *Rocovich v. United States*, 933 F.2d 991, 993 (Fed. Cir. 1991)).

## DISCUSSION

FASA generally limits this Court's jurisdiction and bars protests "in connection with the issuance or proposed issuance of a task or delivery order." 10 U.S.C. § 2304c(e)[8]; *see also* FAR 16.505(a)(10). An exception to the FASA bar exists where a task order increases the "scope, period, or maximum value of the contract under which the order is issued." 10 U.S.C. § 2304c(e)(1)(A); [9] *see also* FAR 16.505(a)(10). Here, however, DynCorp's protest is "in connection with" DCMA's task order, and the protest does not fall within the scope exception to the FASA bar.

In their Motions to Dismiss, the Government and CACI argue that DynCorp's protest is barred pursuant to FASA because the protest is clearly connected to the issuance of the task order and because the relief DynCorp seeks demonstrates that the issuance of the task order is at the heart of the protest. Int.-Def. Mot. at 7; Def. Mot. at 10-11. DynCorp counters, arguing that the

---

[8] For procurements at the Department of Defense, National Aeronautics and Space Administration, and the Coast Guard, FASA is codified at 10 U.S.C. § 2304c(e). For procurements at all other agencies, FASA is codified at 41 U.S.C. § 4106(f).

[9] A protest of an order valued in excess of $25,000,000 is another exception to the FASA bar; the GAO has exclusive jurisdiction over such protests. 10 U.S.C. § 2304c(e)(1)(B), (2).

task order here was awarded to CACI, Inc., an entity that did not hold a GISS IDIQ contract as of the date of award.  Compl. ¶ 26-27.  As explained below, DynCorp's argument is without merit.

## I.    "IN CONNECTION WITH" THE ISSUANCE OF A TASK ORDER

In 2014, the U.S. Court of Appeals for the Federal Circuit (Federal Circuit) squarely addressed the meaning of FASA's "in connection with" language.  *SRA Int'l, Inc. v. United States*, 766 F.3d 1409 (Fed. Cir. 2014).   In *SRA*, a protester alleged that the General Services Administration (GSA) had violated the law by waiving an organizational conflict of interest in the context of a task order award.  *Id.* at 1410.  Because GSA's waiver was discretionary and occurred 102 days after GSA had issued the task order, the Court of Federal Claims held that it had jurisdiction.  *Id.* at 1412.  On appeal, the Federal Circuit disagreed, holding that the Court of Federal Claims lacked jurisdiction because the protest of the waiver was "in connection with the issuance" of the task order.  *Id.* at 1413.  The Federal Circuit held that FASA's plain language requires a broad application of the jurisdiction preclusion, reasoning that FASA's language does not "carve[] out" exceptions for either discretionary actions or actions temporally disconnected from the task order.  *Id.*  Instead the Federal Circuit explained, "[t]he statutory language of FASA is clear and gives the court no room to exercise jurisdiction over claims made in connection with the issuance or proposed issuance of a task order delivery."  *Id.* (internal quotation omitted).  The Federal Circuit further explained that, even "if the protestor points to an alleged violation of statute or regulation[,] the court still has no jurisdiction to hear the case if the protest is in connection with the issuance of a task order."  *Id.*  In addition to the FASA bar's broad plain language, the Federal Circuit also noted that the relief the protester sought further demonstrated the connection between the protest and issuance of the task order.  *Id.* at 1414.  Because the protestor in *SRA* sought rescission of the task order, the Federal Circuit held that this desired relief supported the conclusion

that "[the] protest is actually with the issuance of the task order, rather than the waiver alone."  *Id.* (citations omitted).

Following *SRA*, courts have continued to find that a broad array of protests were made "in connection with" a task order.  *See, e.g.*, *Guam Industrial Services, Inc. v. United States*, 122 Fed. Cl. 546, 556 (2015) (finding "cancelling a task order under an IDIQ contract is 'in connection with' a task order"); *Nexagen Networks, Inc. v. United States*, 124 Fed. Cl. 645, 653 (2015) (denying protest challenging the cancellation of a task order and the corrective action of issuing a different task order); *Akira Technologies, Inc. v. United States*, 145 Fed. Cl. 101, 107 (2019) ("conduct[ing] a noncompetitive sole-source procurement via *task order modification* . . . is 'in connection with' the 'issuance' of a task order" (emphasis in original)); *Insap Services, Inc. v. United States*, 145 Fed. Cl. 653, 655 (2019) (bundling services prior to a task order solicitation is in connection with the task order).

Here, DynCorp's challenge involving CACI's name change and its subsequent award of the task order is "in connection with" the Army's award of the task order to CACI.  This is immediately apparent in the first paragraph of DynCorp's Complaint which states, "[t]his action protests the [Army's] decision to award a task order to CACI Technologies, Inc. under Request for Task Order Proposals No. W911W4-18-R-ER02."  Compl. ¶ 1.  Further, DynCorp appears to acknowledge as much in its response to its motion stating "[DynCorp] is objecting to the Army's award decision under the RTOP and is alleging violations of statute and regulation in connection therewith . . . ."  Pl. Resp. at 8.  It is clear from DynCorp's own statements that the award of the task order is the direct and immediate cause of DynCorp's protest.  Indeed, without the award of the task order, DynCorp would not have any challenge.  *See SRA Int'l Inc.*, 766 F.3d at 1413 (FASA barred an OCI waiver made after the issuance of a task order because the waiver "was directly and

causally connected to issuance of [the task order]"); *see also Mission Essential Pers., LLC v. United States*, 104 Fed. Cl. 170, 179 (2012) (denying protest where the issuance of a task order was the "but for" cause of the protest).

The relief DynCorp seeks further evinces that its protest is "in connection with the issuance of a task order." Here, DynCorp is seeking an injunction prohibiting the Army from proceeding with the performance of the task order awarded to CACI. Compl. at 25. This is the same relief that the *SRA* protestor sought, that, the Federal Circuit explained, demonstrated that the protest was "in connection with" the issuance of a task order. *See SRA Int'l Inc.*, 766 F.3d at 1414.

Finally, even if CACI was not a legal entity at the time of the task order award, DynCorp's protest is still "in connection with" the Army's award of a task order to CACI. As the Federal Circuit underscored in *SRA*, jurisdiction does not exist even where a party alleges a statutory or regulatory violation if the protest is still connected to the issuance of a task order. *Id.* at 1413; *see also Akira Techs., Inc.*, 145 Fed. Cl. at 108 ("FASA bars protests over procurement decisions connected to the issuance of task or delivery orders, including decisions about the assignment of services to certain contractors . . .").

Plaintiff argues that the Army's award of a task order is not in connection with the issuance of a task order because CACI, LLC did not hold the GISS IDIQ contract. Compl. ¶ 26; Pl. Resp. at 8. To support this assertion, Plaintiff relies on *AudioCARE Sys.*, B-283985, 2000 CPD ¶ 24 (Comp. Gen. Jan. 31, 2000) at 2, n.2. In that case, the GAO permitted a protest to a delivery order because "the agency was not simply selecting an indefinite-delivery, indefinite-quantity (ID/IQ) contractor or [Blanket Purchase Agreement (BPA)] holder for issuance of a delivery order; instead, it conducted a competition between a vendor that was [an ID/IQ contractor] and one that was not."

*Id.*  Thus, the GAO concluded that "[w]here a competition is held between an ID/IQ contractor (or BPA holder) and another vendor, we do not believe the statutory bar on protests applies."  *Id.*

DynCorp's reliance on *AudioCARE* is misplaced.  As an initial matter, this Court is not bound by decisions of the GAO.  *See Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1038 n.4 (Fed. Cir. 2009); *see also UnitedHealth Military & Veterans Servs.*, *LLC v. United States*, 132 Fed. Cl. 529, 560 (2017) (citing *CBY Design Builders v. United States*, 105 Fed. Cl. 303, 341 (2012)).  Additionally, *AudioCARE* predates *SRA*'s broad interpretation of the "in connection with" language, which undermines *AudioCARE*'s persuasive value.  Finally, *AudioCARE* is distinguishable.  In *AudioCare*, the competition was purposely expanded to include non-IDIQ contract holders.  *AudioCARE Sys.*, B-283985 at 2, n.2; *see also LBM, Inc.*, B-290682, 2002 CPD ¶ 157 (Comp. Gen. Sept. 18, 2002) ("[FASA] was not intended to, and does not, preclude protests that timely challenge the transfer and inclusion of work [to or from] ID/IQ contracts without complying with applicable laws or regulations, but was to preclude protests in connection with the actual or proposed issuance of an individual task or delivery orders under those contracts.").  In contrast, the competition of the award of the task order at issue here was limited to current GISS IDIQ contract holders; and, as explained below, CACI in fact held the GISS IDIQ contract.

For these reasons, the Court finds that DynCorp's protest is "in connection with" the issuance of a task order, and accordingly that the FASA bar applies.

## II.    TASK ORDER SCOPE EXCEPTION

Since DynCorp's protest is "in connection with" the issuance of a task order, the Court must determine whether the protest meets the narrow FASA scope exception.  Under 10 U.S.C. § 2304c(e)(1)(A), even when a protest is in "in connection with the issuance of a task order," a protest is nonetheless permitted to proceed if the task order increases the scope, period, or

maximum value of the IDIQ contract under which the task order is issued. *See Solute Consulting v. United States*, 103 Fed. Cl. 783, 791 (2012).

Notably, DynCorp does not argue that the task order exceeded the IDIQ contract's statement of work. *See* Nov. 11, 2020 Tr. at 43:24-44:4 (DynCorp's counsel confirming that the issue is not, as the Court described, "about a change in actual work"). Instead, DynCorp argues that the Army exceeded the scope of the GISS IDIQ contract by awarding the task order to an entity that did not hold a GISS IDIQ contract. Pl. Resp. at 10-11. In support of this protest ground, DynCorp explains, "it is well established that '[w]here an agency awards multiple-award IDIQ contracts, orders may only be placed with the firms who received one of the contracts.'" *Id.* (quoting *Engility Corp.*, B-416650 *et al.*, 2018 CPD ¶ 385 (Comp. Gen. Nov. 7, 2018) at 2. In advancing this argument, DynCorp argues that the term "scope" is not limited to "scope of services." *Id.* at 11.

Using Plaintiff's definition, any allegation of change between a task order and IDIQ contract, under which the task order was issued, could circumvent the FASA jurisdictional bar. *See* Pl. Resp. at 13 (first citing definition of Scope, *Merriam-Webster's Collegiate Dictionary*, available online at https://merriam-webster.com/dictionary/scope (last accessed Oct. 28, 2020) (defining scope as "intention" or "object"); and then citing FAR 15.202 ("The agency may publish a presolicitation notice . . . that provides a general description of the scope or purpose of the acquisition . . .")). This interpretation is untenable for several reasons.

DynCorp misunderstands the narrowness of FASA's "scope" exception. Read in isolation, DynCorp's broad definition of scope initially seems plausible; however, the exception's context within FASA is important and necessitates a narrow reading, limiting "scope" to the statement of work in the contract. *See ClearCorrect Operating, LLC v. Int'l Trade Comm'n*, 810 F.3d 1283,

1296 (Fed. Cir. 2015) ("The words of a statute must be read in their context and with a view to their place in the overall statutory scheme." (quoting *King v. Burwell*, 135 S. Ct. 2480, 2492 (2015)); A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts § 24, p. 167 (2012) ("Context is a primary determinant of meaning.").  The term "scope" describes an exception to FASA's jurisdictional bar; consequently, its function as an exception requires a narrow reading. *See Baude v. United States*, 955 F.3d 1290, 1301 (Fed. Cir. 2020) ("Because an exception to a general statement of policy is usually read narrowly in order to preserve the primary operation of the provision, we decline the government's invitation to interpret [the phrase] 'unusual circumstances' so broadly as to operate to the farthest reach of its linguistic possibilities in a manner that contravenes the statutory design." (internal quotations omitted) (quoting *Maracich v. Spears*, 570 U.S. 48, 60 (2013)).  In sum, the "scope" exception to the FASA jurisdictional bar rule cannot be so broad as to swallow the rule; adopting DynCorp's argument would require the Court to violate this basic tenet of statutory construction.

Reading the scope exception within the statute's broader meaning reflects that the scope exception is limited to the contract's the statement of work.  The relevant portion of FASA reads as follows:

> (e) Protests.--(1) A protest is not authorized in connection with the issuance or proposed issuance of a task or delivery order except for--
>
> (A) a protest on the ground that the order increases the scope, period, or maximum value of the contract under which the order is issued; or
>
> (B) a protest of an order valued in excess of $25,000,000.
>
> (2) Notwithstanding section 3556 of title 31, the Comptroller General of the United States shall have exclusive jurisdiction of a protest authorized under paragraph (1)(B).

10 U.S.C. § 2304c(e).  The term "scope" is preceded by the dictate that "[a] protest is not authorized in connection with the issuance or proposed issuance of a task or delivery . . . ."  10

17

U.S.C. § 2304c(e)(1).  As the Federal Circuit noted in *SRA*, the "in connection with" language is interpreted broadly.  766 F.3d at 1413.  This broad language demonstrates an intent to streamline the federal procurement process to allow agencies to issue task orders within the scope, period, and maximum value of the already competed IDIQ contract, from which the task order was issued, without delay from protests.  *See A & D Fire Prot., Inc. v. United States*, 72 Fed. Cl. 126, 133 (2006); *Glob. Computer Enterprises, Inc. v. United States*, 88 Fed. Cl. 350, 405, *modified on reconsideration*, 88 Fed. Cl. 466 (2009).  DynCorp's attempt to shoehorn its protest of CACI's name change into a scope challenge would effectively eviscerate the primary purpose behind the broad FASA jurisdictional bar.  *See United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988) (interpretation must produce "a substantive effect that is compatible with the rest of the law" (internal citation omitted)).

Finally, Congress's use of the term "scope" elsewhere in FASA reflects its intent to limit scope to "the statement of work."  In 10 U.S.C. § 2304a(b), FASA details the requirements for task order solicitations.  The solicitation requirements in section 2304a(b) parallel the exceptions to the FASA jurisdictional bar listed in section 2304c.  *Compare* 10 U.S.C. § 2304a(b)(1)-(3) (requiring the contract's (1) period, (2) maximum quantity or dollar amount for service or property, and (3) *statement of work* or specifications) (emphasis added) *with* 10 U.S.C. § 2304c(d) (barring protests in connection with the issuance of a task order except for protests arguing that the order increases the contract's (1) scope, (2) period, or (3) maximum value).  This parallel is informative because section 2304a(b) characterizes "statement of work" as a "description that reasonably describes the *general scope*, nature, complexity and purposes of the services or property to be procured under the contract."  10 U.S.C. § 2304a(b) (emphasis added).  Congress clearly intended to cabin "scope" to the underlying contract's "statement of work."  Accordingly, this Court must

interpret the term scope consistently throughout the act. *See Sorenson v. Sec'y of Treasury of U.S.*, 475 U.S. 851, 860 (1986) ("The normal rule of statutory construction assumes that 'identical words used in different parts of the same act are intended to have the same meaning.'" (quoting *Helvering v. Stockholms Enskilda Bank*, 293 U.S. 84, 87 (1932)); *Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718, 1723 (2017) (unanimous decision) (explaining that a court must have a "persuasive reason" to "abandon our usual presumption that 'identical words used in different parts of the same statute' carry 'the same meaning'" (quoting *IBP, Inc. v. Alvarez*, 546 U.S. 21, 34 (2005))).

In its response, DynCorp attempts to support its expansive scope definition arguing, "other judges on this court have acknowledged that for FASA purposes, the 'scope' of the contract encompasses areas beyond a scope of work." Pl. Resp. at 14. DynCorp offers one citation in support of that contention—a footnote in *Innovative Mgmt. Concepts, Inc. v. United States*, 119 Fed. Cl. 240, 245 n.7 (2014). DynCorp incorrectly relies on *Innovative Mgmt. Concepts, Inc*. There, the court found that it did not have jurisdiction pursuant to FASA because the protestor did not challenge the terms of the underlying IDIQ contract and instead challenged the task order award. *Id.* The court concluded that it lacked jurisdiction under FASA despite claims that the task order exceeded the scope of the IDIQ contract. *Id.* at 245. The footnote DynCorp cites did not discuss scope, but rather addressed the merits of the protestor's argument, under a scenario where the court, *arguendo*, had jurisdiction. *Id.* at 245 n.7.

Other Court of Federal Claims cases have similarly rejected DynCorp's proposed expansive definition of "scope". *See Solute Consulting*, 103 Fed. Cl. at 791. For example, in *Solute*, the protester argued that the awardee's task order proposal departed from the underlying contract's accounting system, subcontracting plan, and key personnel requirements. *Id.* The

protestor argued, therefore, that awarding a task order to the awardee exceeded the scope of the underlying contract. *Id.* The court rejected this argument, holding that not every difference between a task order and the underlying contract amounts to an increase in scope. *Id.* The court reasoned that such an expansive interpretation of the scope exception to the FASA jurisdictional bar would render the bar meaningless because "all protests related to task orders would fit within the 'increases the scope' exception set forth in 10 U.S.C. § 2304c(e)(1)(A)." *Id.* Instead, the court found that "scope" in section 2304c(e)(1)(A) refers to the work authorized by the underlying IDIQ contract. *Id.* at 792-93. Relying on the Federal Circuit's decision in *AT&T Communications, Inc. v. Wiltel, Inc.*, 1 F.3d 1201, 1205 (Fed. Cir. 1993), the court held that the proper test for determining whether a "[task] order increases the scope . . . of the contract under which the order is issued" is whether the work called for in the task order "generally falls within the scope of the original procurement [so that] potential bidders would have expected it to fall within the contract's changes clause." *Id.* at 791-93.

This Court agrees with the reasoning in *Solute*. The Federal Circuit in *AT&T* articulated the proper test for determining whether the task order at issue exceeds the scope of the GISS IDIQ. In *AT&T*, a case decided shortly before FASA was enacted, the Federal Circuit addressed the issue of whether a contract modification can circumvent the Competition in Contracting Act (CICA) statutory competition requirement by "exceeding the scope" of the underlying procurement.[10] In addressing this issue, the Federal Circuit borrowed from its cardinal change jurisprudence, explaining:

> [A] cardinal change . . . occurs when the government effects an alteration in the work so drastic that it effectively requires the contractor to perform duties materially different from those originally bargained for. By definition, then a

---

[10] The Court decided *AT&T* in July 1993, and FASA became law in October 1994.

cardinal change is so profound that it is not redressable under the contract, and thus renders the government in breach.

1 F.3d at 1205 (quoting *Allied Materials & Equip. Co. v. United States*, 569 F.2d 562, 563-64 (Ct. Cl. 1978). The court analogously explained that a modification violates CICA when the modification "materially departs from the scope of the original procurement." *Id*. (citing *See Neil R. Gross & Co*., B–237434, 69 Comp. Gen. 247 (February 23, 1990) at 2-3, *aff'd on reconsideration*, B-237434.2, 90-1 CPD ¶ 491 (Comp. Gen. May 22, 1990); *Am. Air Filter Co*., 57 Comp. Gen. 567, 572 (1978) (affirming on reconsideration 57 Comp. Gen. 285 (1978)). This analysis focuses on "whether the solicitation for the original contract adequately advised offerors of the potential for the type of changes during the course of the contract that in fact occurred, or whether the modification is of a nature which potential offerors would reasonably have anticipated." *AT&T*, 1 F.3d at 1207. In applying this test, the Federal Circuit compared the services called for in the original procurement with the services as modified and found that, because the modified services could have been anticipated by bidders during the solicitation phase, the modification did not violate CICA's competition requirements. *Id.*

Though the Federal Circuit has never explicitly articulated a test to determine whether, under FASA, a "[task] order increases the scope . . . of the contract under which the order is issued," the Court of Federal Claims has held that the standards articulated in *AT&T* are applicable to the scope exception to the FASA jurisdictional bar. 10 U.S.C. § 2304c(e)(A); s*ee BayFirst Solutions, LLC v. United States*, 104 Fed. Cl. 493, 502 (applying the *AT&T* standard in determining whether the task order exceeds the scope of the IDIQ contract); *see also North Wind Site Servs., LLC v. United States*, 142 Fed. Cl. 802, 812-13 (2019) (citing *AT&T* for the proposition that "[i]n order for there to be a change in scope, there must be a material change so significant that it amounts to a cardinal change" (internal citation and quotation omitted)); *Global Computer Enters.,*

*Inc. v. United States*, 88 Fed. Cl. 350, 425-45 (2009) (applying the *AT&T* standard in determining whether the task order exceeds the scope of the IDIQ contract).

In applying the *AT&T* standard to the FASA context, the Court of Federal Claims has consistently interpreted the term "scope" to reference the statement of work in the underlying IDIQ contract, and DynCorp's scope assertions are at odds with this Court's established precedent. *See Solute Consulting v. United States*, 103 Fed. Cl. 783, 785, 792 (2012) (citing *Phoenix Air Group, Inc. v. United States*, 46 Fed. Cl. 90, 105-106 (2000)); *Omega World Travel, Inc. v. United States*, 82 Fed. Cl. 452, 456, 464 (2008).

The Court of Federal Claims' consistent adoption of the standard articulated in *AT&T* makes sense. FASA accomplishes its policy goal of streamlining procurement by barring certain protests at the task order level. The assumption is that that the underlying IDIQ contract has already been subjected to full and open competition requirements of CICA. *See* 10 U.S.C. § 2304a(c). However, when a task order drastically increases the scope, as delineated in the underlying IDIQ contract's statement of work, the task order is essentially a new procurement which was never subjected to full and open competition—in contravention of CICA. *See* 10 U.S.C. § 2304(a)(1)(A).[11] When a task order exceeds the statement of work outlined in the underlying

---

[11] The GAO applies a similar test. In *Dyncorp Int'l LLC*, B-402349, the GAO explained:

The analysis of whether a task order is outside the scope of a multiple-award contract is the same as the analysis of whether a contract modification is outside the scope of a single-award contract. *Anteon Corp.*, [B-293523 *et al.*, 2004 CPD ¶ 51 (Comp. Gen. Mar. 29, 2004)] at 4-5. In addition, the law in this area is well-settled. In determining whether a task order is beyond the scope of the contract, GAO and the courts look to whether there is a material difference between the task order and that contract. *Id.* at 5; *MCI Telecomms. Corp.*, B–276659.2, Sept. 28, 1997, 97-2 CPD para. 90 at 7; *see also AT&T Commc'ns, Inc. v. Wiltel, Inc.,* 1 F.3d 1201, 1204 (1993); *CCL, Inc.,* 39 Fed. Cl. 180, 191-92 (1997). Evidence of such a material difference is found by reviewing the circumstances attending the procurement that was conducted; examining any changes in the type of work,

IDIQ contract, it is not only the IDIQ contract holders who suffer.  In these circumstances, non-IDIQ contract holders are deprived of the opportunity to compete, and the Government is deprived of the benefit of competition.  *See Astronautics Corp. of Am.,* 70 Comp. Gen. 554, 556 (June 5, 1991) ("[While GAO's bid protest regulations require dismissing] protests involving contract administration matters . . . , [GAO] will, however, consider a protest that a delivery order issued under an existing contract is beyond the scope of that contract, changing the nature of the contract originally awarded, because the work covered by the delivery order would be subject to requirements for competition absent a valid sole-source determination."); *Comp. Gen. Decision*, B-207389, 30 CCF ¶ 70,062 (June 15, 1982) (reasoning that contract modifications tantamount to unjustified sole-source awards, in lieu of competitive procurements, will adversely impact upon the integrity of the competitive procurement process).  Congress carefully balanced the need for competition, as expressed in CICA, with the need for administrative efficiency, as promoted in FASA.  Applying the test outlined in *AT&T* to the scope exception of FASA's jurisdictional bar preserves the balance Congress struck between these two competing issues.

Thus, to establish jurisdiction under the scope exception in FASA, DynCorp needs to show that the statement of work described in the Performance Work Statement (PWS) for the Solicitation is beyond the PWS for CACI's GISS IDIQ contract.  *See e.g.*, *Solute Consulting*, 103 Fed. Cl. at 793 (examining the task order solicitation's PWS *vis-à-vie* the scope of work as

---

performance period, and costs between the contract as awarded and as modified by the task order; and considering whether the original contract solicitation adequately advised offerors of the potential for the type of task order issued. *Anteon Corp., supra,* at 5; *Data Transformation Corp.,* B-274629, Dec. 19, 1996, 97-1 CPD para. 10 at 6. The overall inquiry is whether the task order is of a nature that potential offerors would reasonably have anticipated. *Anteon Corp.,* B-293523, B-293523.2, Mar. 29, 2004, 2004 CPD para. 51 at 5.

2010 CPD ¶ 59 (Comp. Gen. Mar. 15, 2010) at 4.

described in the underlying contract).  But here, DynCorp does not contend that the services and

products described in the RTOP PWS are beyond the services and products described in the PWS

for CACI's GISS IDIQ contract.  *See* Nov. 11, 2020 Tr. at 43:24-44:4.

Instead, the broad language in the underlying GISS IDIQ contract encompasses the scope

found in the RTOP PWS.  The "scope" of the services and products anticipated to be purchased

under the GISS IDIQ contract, through task orders, is described broadly:

> **C.1.2 Objective / Scope.**
> The purpose of this acquisition is for INSCOM to provide more responsive
> acquisition of services for current and future Army intelligence, security, and
> information operations requirements and related support services. These services
> will supply resources that support a breadth and depth of various missions including
> but not limited to: intelligence analysis, electronic systems, Intelligence
> Surveillance and Reconnaissance (ISR) Systems, security systems, Quick Reaction
> Capability (QRC) systems, prototype intelligence hardware/software suites,
> facilities that are developed, deployed, maintained and repaired at the highest state
> of readiness, and business functions consistent with Army directives and standards.

Tab 1 at AR 17.  In conformity with the IDIQ contract, the PWS for the task order at issue seeks

services to support "tactical, operational, and strategic intelligence units, personnel and their

ground and aerial intelligence equipment and operations facilities and infrastructure and may occur

from multiple locations simultaneously."  Task Order Solicitation PWS at 2 (ECF No. 28-1).

These services are well within the bounds of the IDIQ contract.  Further, as noted, the services

under the GISS IDIQ contract remained unchanged during CACI's conversation from a

corporation to a limited liability company.  *See Supra* Background, Section I; *infra* Discussion,

Section III.  Moreover, even if this Court were to broaden the definition of scope beyond scope of

work, DynCorp's protest would still be barred under the standard articulated in *AT&T* because

name changes under FAR 42.1205 and novations under FAR 42.1204 are matters routinely

handled as a part of contract administration and clearly do not fall outside the changes clause or

amount to a new procurement.  *See AT&T*, 1 F.3d at 1205 (citing *Am. Air Filter Co.*, 57 Comp. Gen. 567, 573 (June 19, 1978)).

## III.    The CACI Corporate Conversion

Even assuming, *arugendo*, that the scope exception is exceptionally broad and applies to far more than the scope of work in a contract, DynCorp's argument would still fail.  DynCorp asserts that CACI Technologies, Inc., a corporation established under the laws of Virginia, underwent a statutory conversion on December 31, 2017, creating an entity organized as a limited liability company.   According to DynCorp, under VA Code § 13.1-722.13(A)(7), CACI Technologies, Inc. immediately ceased to exist because of that conversion.   Compl. at ¶ 6. DynCorp contends that, therefore, the Army awarded the May 2020 task order to an entity, CACI, Inc., that had legally ceased to exist two-and-a-half-years earlier. *Id.* at ¶ 14.  DynCorp argues that the Army's award of a task order to an entity that did not exist and that allegedly never submitted a legitimate proposal conflicts with the terms of the GISS IDIQ contract, which anticipated that task orders would only be awarded to contractors that submitted proposals. *Id.* ¶¶ 6, 14.  DynCorp claims that CACI's submission of an invalid proposal meant that "the CACI family of companies" was able to rely on a proposal that was "never binding on any particular CACI affiliate" and was able to make representations and offers in the proposal that were not binding. *Id.* ¶¶ 123, 135. DynCorp also argues that CACI should have complied with the procedures in FAR 52.204-13(d). *See* Pl. Resp. at 18-19.  Importantly, DynCorp does not allege that CACI acted improperly under FAR 42.1205.  *See* Nov. 11, 2020 Tr. at 53:21-54:2 ("[DynCorp is] not contesting the [name change] agreement with DCMA, the propriety of the agreement.").

In response, CACI argues that its name change is not an event that divested it of its status as an IDIQ contract holder.  Int.-Def. Mot. at 24.  Instead, CACI contends that the applicable

provisions of FAR regarding name changes make clear that the Government's and contractor's rights and obligations remained unaffected by a name change. *Id.* CACI further contends that the approach it took was a practical necessity to facilitate payments under contracts during the name change process and notes that, during the period when DCMA is reviewing a conversion transaction, the Government's payment offices continues to process payments by matching the contractor's name in SAM with the name on the contract/invoice. *Id.* at 29. If the legal entity's new name were used prior to completion of DCMA's name change process, there would be a disconnect between the contractor's name in SAM and the name on the contract/invoice—and payments would be delayed. *Id.*

This Court agrees with the Government and CACI. CACI's name change and conversion complied with the FAR, and nothing in Virginia law invalidates the Army's award to CACI. Consequently, CACI's name change and conversion from CACI, Inc. to CACI, LLC did not affect the Army's award to CACI in any way.

The FAR has specific processes to address this exact circumstance when a company undergoes a name change or conversion. The FAR recognizes that—even if the name for an entity changes—the legal obligations of the entity remain unaffected, including the right to contract with the Government. *See* FAR 42.1205(a), (b) (stating, in paragraph (a)(3) of the "Change-of-Name Agreement" template, that "this amendment accomplishes a change of corporate name only[,] and all rights and obligations of the Government and of the Contractor under the contracts are unaffected by this change").

If a contractor is only changing its name and the Government's and contractor's rights and obligations remain unaffected, the FAR requires the parties to execute a "change of name agreement" to reflect the name change. FAR 42.1205(a). Under this process, the contractor gives

the contracting officer responsible for the agreement three signed copies of the "change of name agreement" and one copy each of the following:

> (1) The document effecting the name change, authenticated by a proper official of the State having jurisdiction.
>
> (2) The opinion of the contractor's legal counsel stating that the change of name was properly effected under applicable law and showing the effective date.
>
> (3) A list of all affected contracts and purchase orders remaining unsettled between the contractor and the Government, showing for each the contract number and type, and name and address of the contracting office.  The contracting officer may request the total dollar value as amended and the remaining unpaid balance for each contract.

FAR 42.1205(a).

Here, the Government clearly followed the processes under FAR 42.1205 and properly executed the Change-of-Name Agreement with CACI.  In late-November 2017, prior to its name change, CACI corresponded with DCMA about the "Conversion Agreement," and DCMA sent CACI a template conversion agreement.  *See* Int.-Def. Reply Exhibit A (ECF No. 39-1).  On March 13, 2018, CACI sent a "Contracts Conversion Approval Package" to DCMA.  *See* Tab 98 at AR 4798-99.  The package contained the "Conversion and Name Change Agreement."  *See id.* at AR 4800-01.[12]  The package also contained the required elements under FAR 42.1205(a).  *See id.* at AR 4798-4878.  CACI submitted a certification of entity conversion from the Commonwealth of Virginia.  *Id.* at 4868-4870; *see also* FAR 42.1205(a)(1) (requiring the "document effecting the name change . . .").  CACI also submitted a letter from its General Counsel stating that the

---

[12] The contract language CACI submitted differed slightly from both the template DCMA emailed to CACI in November 2017, Int.-Def. Reply Ex. A (ECF No. 39-1) at 3-6, and the sample language contained in FAR 42.1205(b)—CACI noted the difference in its brief.  *See* Int.-Def. Reply at 10. However, FAR 42.1205(b) states that "[t]he following suggested format for an agreement may be adapted for specific cases," and no party has indicated that this difference is a material issue in the present case.

conversion "was duly and properly effected under applicable law and that the effective date of the Contractor's conversion was December 31, 2017." *Id.* at 4872-73; *see also* FAR 42.1205(a)(2) (requiring the "opinion of the contractor's legal counsel stating that the change of name was properly effected under applicable law and showing the effective date"). CACI further submitted a list of contracts between CACI and the Government. *See id.* at 4805-66; *see also* FAR 42.1205(a)(3) (requiring a "list of all affected contracts and purchase orders remaining unsettled between the contractor and Government . . ."). In addition, on April 6, 2020, the DCMA administrative contracting officer signed the agreement. *See* Tab 98 at AR 4802 (signing date shown in digital signature stamp). The duly executed Name Change Agreement, mutually agreed upon by CACI and DCMA, indicates that the Government was fully aware of CACI's name change at the time of the award and that CACI assumed all obligations and liabilities of the GISS IDIQ. *See* Tab 98 at AR 4800-03.

The Army's consistent use of CAGE codes further demonstrates that the Army was fully aware of the identity of the entity to which it awarded the task order. The Defense Logistics Agency assigns CAGE codes, which are normally five-digit numbers, and are used to identify a commercial or government entity. *See* 48 C.F.R. § 2.101 (defining CAGE codes). Thus, federal agencies, such as the DCMA and the Army, may reasonably rely on CAGE codes to accurately identify contractors. *See Femme Comp Inc. v. United States*, 83 Fed. Cl. 704, 744 n.26 (2008) ("CAGE codes are used to dispositively establish the identity of a legal entity for contractual purposes." (internal quotations and citation omitted)); *United Valve Co.*, B-416277 *et al.*, 2018 CPD ¶ 268 (Comp. Gen. July 27, 2018) at 6. CACI used the CAGE Code 8D014 pre- and post-conversion. *Compare* Tab 27.1 at AR 1338.1 (using Cage Code 8D014 on an RFP CACI submitted on October 12, 2018) *with* Tabs 72.1 at AR 3406.1; 103.1 at AR 5126 (using Cage Code 8D014

on an Amendment of Solicitation/Modification of Contract CACI submitted on May 27, 2020 and August 25, 2020).  This Court agrees with the GAO, which found that the continuity of CACI's CAGE Codes confirms that the contract offeror is the same entity as the contract awardee.  GAO Decision at AR 4767.

CACI's adherence to FAR 42.1205 and the consistent use of the CAGE code 8D014 to reflect the contract awardee supports the conclusion that the Army awarded the contract to the correct, IDIQ-contract-holding entity.  Transparency, reliability, and traceability are important objectives in Federal procurement.  Further, "[a]ccurate identification of prospective and incumbent government contractors (and vendors) facilitates the federal government's procurement process, helping to ensure contractors are paid, supporting contract administrations activities, enabling identification of corporate families . . . and, generally, contributing to the transparency of federal government procurement."  L. Elaine Halchin, Cong. Research Serv., R44490, *Unique Identification Codes for Federal Contractors: DUNS and CAGE Codes* 1 (May 31, 2017).  Unique identifiers, such as CAGE Codes, and FAR regulations exist to meet such objectives.  *See* 79 Fed. Reg. 31187 (May 30, 2014) (amending the FAR to require CAGE Codes for certain awards).  Here, CACI complied with FAR 42.1205—the regulatory requirements governing a contractor's change of name.  CACI demonstrated, through consistent use of the CAGE code 8D014, that the entity which submitted its proposal in January 2020 is the same entity that received the award in May 2020.

DynCorp's arguments based on FAR 52.204-13(d) and Virginia law lack merit.  FAR 52.204-13(d)(1)(i)(B) requires that CACI notify its "responsible Contracting Officer"[13] of its

---

[13] Both CACI and the Defendant state that DCMA is the agency of CACI's "responsible contracting officer," and Plaintiff does not contest this assertion.  *See* Compl. ¶ 82. ("[A] DCMA

intentions unless it has "completed the necessary requirements regarding novation and change-of-name agreements in subpart 42.12." As noted, CACI fulfilled the FAR 42.12 requirements when it submitted its "Contracts Conversion Approval Package" to DCMA on March 13, 2018. *See* Tab 98 at AR 4798-99. Again, DynCorp does not contest this fact. *See* Nov. 11, 2020 Tr. at 53:21-54:2. Accordingly, CACI did not violate FAR 52.204-13(d).[14]

Under Virginia law, DynCorp argues that, following CACI's conversion, CACI, Inc.—the holder of the GISS IDIQ contract—ceased to exist. Pl. Resp. at 18. However, DynCorp's argument begins with the wrong premise. As discussed above, the correct underlying premise is that CACI complied with the relevant federal regulations relating to name changes, such as FAR 42.1205 and its use of CAGE codes. Once the Government completed its analysis of the name-change process, it determined that the name change was retroactive to December 31, 2017, when CACI's name change was effective for purposes of Virginia law. *See* Tab 98 at AR 4802. Moreover, contrary to DynCorp's assertions, Virginia law appears to recognize that CACI, Inc. and CACI, LLC function as the same entity following a corporate conversion. The Virginia Code states that following a corporate conversion, "[t]he resulting entity is deemed to . . . [b]e the same entity without interruption as the converting entity that existed before the conversion[, and t]he

---

Corporate Administrative Contracting Officer executed an agreement . . . that purported to be with both CACI Technologies, Inc. and CACI Technologies, LLC."); *see also* Def. Reply at 16 ("DCMA . . . is the Administrative Contracting Officer (ACO) that was the responsible contracting officer under the FAR for handling the name change."); Int.-Def. Mot. at 25 n.3 ("DCMA is the agency of the administrative contracting officer who was authorized to execute a change-of-name agreement with respect to CACI's contracts on behalf of the entire Government pursuant to FAR 42.1202.").

[14] Even if CACI did not meet the requirements in FAR 52.204-13(d), the result would have been a suspension of payment and not the relief DynCorp seeks—an injunction prohibiting performance of the task order. *See* FAR 52.232-33(d) (containing the "suspension of payment" clause and stating "[i]f the Contractor's EFT information in the SAM is incorrect, then the Government need not make payment to the Contractor under this contract . . ."); *see also* Compl. at 25 (prayer for relief).

converting entity shall cease to be a corporation when the certificate of entity conversion becomes effective." VA Code § 13.1-722.13(A)(6)-(7). Nothing in Virginia law states that an award of a federal government contract made under the previous name is invalidated following such a conversion. Most importantly, the Name Change Agreement gave retroactive effect to the name change so the legal obligations between CACI and the Army under the GISS IDIQ remain unaffected by CACI's name change. *See* Tab 98 at AR 4801.

Accordingly, even if this Court had jurisdiction to consider DynCorp's substantive claims, it would still find that DynCorp's claims are without merit.

## CONCLUSION

This Court **GRANTS** Defendant's and Intervenor-Defendant's Motions to Dismiss for lack of jurisdiction (ECF Nos. 28, 29). The Clerk of Court is **DIRECTED** to enter Judgment accordingly.

Within fourteen (14) days of this Memorandum and Order, the parties shall **CONFER** and **FILE** a **NOTICE**, attaching a proposed public version of this Memorandum and Order, with any competition-sensitive or otherwise protected information redacted.

IT IS SO ORDERED.

s/Eleni M. Roumel
ELENI M. ROUMEL
Chief Judge

Dated: February 5, 2021
Washington, D.C.

31